**Richard UNDERWOOD, d/b/a Alaska Feed Co., Appellant,**

v.

**FAIRBANKS NORTH STAR BOROUGH, Appellee.**

No. 7105.

Supreme Court of Alaska.

Dec. 16, 1983.

Millard F. Ingraham, Fairbanks, for appellant.

Terrence H. Thorgaard, Asst. Borough Atty., Fairbanks, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

COMPTON, Justice.

This is an appeal brought by Richard Underwood, doing business as the Alaska Feed Company, from a judgment of the superior court entered against him for sales taxes and penalties he owes to the Fairbanks North Star Borough for the 1976–1981 tax years. Underwood contends that the judgment should be reversed because it is based upon an inaccurate and improperly performed audit. We agree in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Richard Underwood is the owner of the Alaska Feed Company, a retail business in the Fairbanks North Star Borough ["the Borough"]. In 1978, the Borough demanded permission to audit Underwood's business records to determine whether he had properly collected the two percent sales tax levied by the Borough. Following Underwood's refusal, the Borough instituted an action to compel him to permit the audit. The Borough also requested a judgment for the taxes and penalties owed "as may later be determined." In response to various arguments made by Underwood, the superior court dismissed the Borough's action. On appeal, however, we reversed the superior court's judgment, holding that the Borough may maintain a civil action to compel a business to produce its records for audit. We remanded the case to the superior court for further proceedings. *Fairbanks North Star Borough v. Underwood,* 626 P.2d 574 (Alaska 1981).

On remand, the Borough served Underwood with a Request for Production of Documents. Underwood refused to comply with the Request. The Borough then moved for an Order Compelling Discovery, which was issued by the court. Underwood refused to comply with this order, as well. The Borough moved for summary judgment as a sanction for Underwood's disobedience of the order. The court granted the motion and entered a judgment against Underwood in the amount of $117,265.82, plus costs and interest. Underwood filed a notice of appeal from this judgment.

The parties subsequently entered into a stipulation of settlement consisting of the following terms: Underwood agreed to dismiss his appeal and produce all of the business records requested for the audit; in return, the Borough agreed to conduct its audit and then move for a new judgment in the amount determined by the audit to be due, reserving to Underwood the right to contest this amount. Upon completion of the audit, the Borough moved for a new judgment against Underwood in the amount of $28,697.72. The taxes determined to be due by the Borough's audit amounted to $19,348.86. By Borough ordinance, the civil penalty for failing to collect the proper sales taxes is that the seller must pay twice the amount of the tax that should have been collected. Fairbanks North Star Borough Ordinance ["Ordinance"] 3.48.160(C). The Borough's request for a judgment in the amount of $28,697.72, rather than $38,697.72, was the result of a clerical error. It has moved for leave to correct that error.

Underwood opposed the motion for a new judgment in this amount, contending that the audit was not performed properly and was inaccurate. The superior court apparently rejected all of Underwood's arguments. It entered a judgment for the Borough in the amount requested, plus interest and costs. From this judgment, Underwood now appeals.

## II. AUDIT PROCEDURE

Underwood's first argument is that the Borough did not conduct its audit properly. The procedure used was as follows: The Borough's auditor examined Underwood's business records for the three-month period of July, August and September, 1977. During that period, Underwood claimed that $159,404.38 of his sales were either excepted from taxable sales or exempt from the levy of tax under Borough ordinances. The auditor determined that $52,656.95 of these sales were sales for which Underwood should have collected a tax. Therefore, thirty-three percent of the sales for which Underwood did not collect a tax were determined by the auditor to have been taxable sales. This percentage was considered to be Underwood's "error rate."

During the period at issue, from May 16, 1975, to June 30, 1981, Underwood reported $2,931,645.54 in sales that he claimed were either excepted from taxation or exempt from the levy of the tax. The auditor applied Underwood's "error rate" to these sales and concluded that thirty-three percent of these sales, or $967,443.03, were not excepted or exempt from taxation. The sales tax in effect at the time was two percent. Applying this percentage, the auditor concluded that Underwood had failed to collect $19,348.86 in sales taxes that should have been collected.

The Borough argues that the procedure it used was permissible for the following reasons:

> The audit having been made in contemplation of reducing the judgment against Underwood, is not exactly the tax audit of the type which the Borough customarily performed. . . . The Underwood audit

was not to make an assessment, it was done pursuant to stipulation to correct a judgment in Underwood's favor. Furthermore, Underwood didn't express any objection to the test period projection method until his opposition to the Borough's judgment motion. By this time the Borough no longer employed auditors. Therefore, Underwood was estopped from disputing the test period projection.

Underwood argues that the sampling method was unreasonable because a better method of determining tax liability existed, namely, audit all the records. We agree that the figures a full-scale audit would have produced would have been more accurate than the estimate on which the Borough relies, but we see no reason to force the Borough to bear the expense of interpreting all the records Underwood has surrendered. The difference between the deficiency figure a statistically valid estimate produces and the deficiency a full-scale audit suggests will usually be far less than the added expense of conducting a full audit. If courts force a taxing authority to bear this additional cost even though a taxpayer's miscalculations have caused the problem, they rob it of resources with which it could be providing services. *W.T. Grant Company v. Joseph,* 2 N.Y.2d 196, 159 N.Y. S.2d 150, 155–56, 140 N.E.2d 244, 249–50 (1957), is in accord with this view:

> Even where an item by item audit is possible . . . there is no inflexible requirement that the comptroller resort to it. It is sufficient if the method adopted is reasonably calculated to reflect the taxes due.

■ The parties stipulated that Underwood "shall produce for [the Borough] *for purpose of audit* by [the Borough], *all of the documents and records requested* to be produced." (Emphasis added) After the material is produced, how any tax arrearages are to be proven in court is a matter properly committed to the appropriate rules of evidence. Samples are generally receivable in evidence "to show the quality or condition of the entire lot or mass from which"

they are taken. 2 J. Wigmore, Evidence § 439, at 522 (Chadbourn rev. ed. 1979).

■ The question becomes whether the sample used was large enough to be statistically reliable and, if so, whether there is something about the sample period that makes it atypical. These questions can go to both the admissibility and to the weight of the evidence. Here the evidence has been stipulated as admissible, and thus the only question is what weight should be given it. Underwood has not contended that the sample is too short a period to be reliable, or that the period was atypical. Therefore, we conclude that the trial court did not err in relying on the evidence presented on the ground that it was a sample.

## III. ACCURACY OF THE AUDIT

■ Underwood does not deny that he is liable for a civil penalty of double the amount of any taxes he should have, but did not, collect during the three-month period for which he was audited. He does dispute, however, the accuracy of the Borough's audit. The parties' stipulation specifically reserved to Underwood the right to contest the amount determined by the Borough to be due. We agree with Underwood that the Borough's "Motion for Amended Judgment" was in actuality a motion for summary judgment. Accordingly, the superior court should have granted the motion only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that *there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.*" Alaska R.Civ.P. 56(c) (Emphasis added).

Underwood does not challenge all of the Borough's determinations as to the sales for which he should have, but did not, collect taxes. For example, Underwood initially reported a multitude of sales as exempt from taxation because the property purchased was to be used outside of the Borough. This is an exemption that has been recognized by the Borough. As a result of its audit, the Borough determined that Underwood should have collected sales taxes

on $15,099.01 of those sales. Underwood contends that $9,525.82 of those sales are exempt, which will be discussed below. He does not, however, challenge the remaining $5,573.19 of those sales. Similarly, Underwood concedes that he should have collected taxes on another $300.25 in sales. As to these unchallenged items, it was appropriate for the superior court to grant the Borough's motion.

■ Underwood claims he should not be liable for the collection of taxes on $4,569.56 in sales he made to persons who refused to pay the tax. This situation is addressed by Ordinance 3.48.120(B), which provides as follows:

Unless the seller knows that the tax does not apply, he shall require the buyer to execute a "certificate of exemption or exception" upon a form furnished by the borough. Unless the certificate is properly filled out and filed with the seller, the seller shall collect the tax imposed hereby. If it is properly executed and filed with the seller, the claim may be allowed if the seller believes that the claim is valid. But should a dispute arise between the buyer and seller as to whether or not any sale is taxable hereunder, the seller shall collect and the buyer shall pay such tax, and the seller shall thereupon issue to the buyer a certificate on forms prescribed by the borough, showing the names of the seller and buyer, the details of the sale, the date, price, amount of tax paid and a brief statement on the claim of exemption or exception. The buyer thereafter may apply to the mayor for a refund of such taxes, and it shall be the duty of the mayor to determine the question of refund.

Underwood did not have his customers execute the specified certificate of exemption or exception. Furthermore, he *does not contend that he knew that the tax did not apply to them.* Underwood merely asked the customers refusing to pay the tax to sign the invoice, stating that they refused to pay the tax and stating the reasons for their refusal. Underwood contends that

this constituted "substantial compliance" with the ordinance. He based his procedure on Sales Tax Information Bulletin No. 75–1, which provided that a "certificate of exemption or exception must be completed when a sales invoice or similar document is not used in a transaction." Underwood states that he took this to mean that he did not need to have the customer complete a certificate if he used a sales invoice. We find Underwood's interpretation unreasonable and his reliance on the bulletin to be misplaced. The bulletin was not addressing the situation in which a customer refuses to pay the sales tax. The ordinance, on the other hand, specifically addresses that situation. It is apparent that Underwood should have abided by the ordinance. Accordingly, we agree with the Borough that Underwood is liable for failing to collect the proper sales taxes on these transactions.

We also agree with the Borough that it was appropriate for the superior court to grant the Borough's motion as to the $868.42 in sales of dog and cat food to farmers, for which Underwood did not collect any sales taxes. Underwood does not raise any factual disputes on these sales, but merely contends that the sales were exempt from taxation under Ordinance 3.48.050(I), which provides an exemption for "sales of animal food, seed, plants, and fertilizer to farmers *for farm use.*" (Emphasis added) We agree with the Borough that, properly interpreted, this ordinance was not intended to and does not provide a tax exemption for pet food purchased by a pet owner merely because that owner also happens to be a farmer. Of course, some dogs have a working function on farms, and some farmers may raise dogs or cats for profit. Underwood, however, has not shown that the sales in question fell within such categories. The burden is on the taxpayer to show his eligibility for a tax exemption. *Greater Anchorage Area Borough v. Sisters of Charity of the House of Providence,* 553 P.2d 467, 469 (Alaska 1976). Accordingly, Underwood's contention on this point must fail.

Another category of sales challenged by Underwood is what the parties term "sales to government agencies." There is only one item in this category—a $3.94 sale of "nipples and milk substitute for dogs," to the Department of Fish and Game. Sales to the State of Alaska are exempt from taxation under Ordinance 3.48.050(F). If Underwood is able to establish that the sale was to the Department of Fish and Game for state business, the sale should indeed be considered exempt from taxation. Although we are cognizant of the attitude that "it is the principle that matters," we would suggest nonetheless that, for the trivial amount at issue, it might behoove the parties to reach a settlement on this item.

A.  *Sales to Persons With Seller's Agent Cards*

Turning to the more serious issues presented in this case, Underwood argues that $9,525.82 of the sales deemed taxable by the Borough were exempt as a matter of law because they were sales to persons who had valid "Seller's Agent" cards on file with the Borough. Underwood contends that this necessarily means that the sales were for purchases to be used outside of the Borough, which would make the sales tax exempt. Ordinance 3.48.055(B) requires all persons who obtain a Seller's Agent card to affirm that they will not use the card to purchase property unless the property is to be used or consumed outside of the Borough. As the Borough notes, however, someone possessing such a card may nonetheless purchase property for use within the Borough, not relying upon the card. Thus, it cannot be determined on the record before the court whether these sales were exempt or not. In order to prove that the sales were exempt, Underwood must establish on remand that his customers claimed the tax exemption and were entitled to it because they would be using the purchased property outside of the Borough.

We also reject the Borough's argument that the sales were taxable as a matter of law because Underwood failed to

mark the customers' card numbers on the invoices or sales slips, as required by Sales Tax Information Bulletin No. 75–1. We agree with Underwood that this bulletin did not necessarily create substantive laws, controlling the tax status of particular transactions. Ordinance 3.48.120(C) provides that "[t]he mayor may by rule require that sales tax returns must be accompanied by appropriate proof as to claimed exemptions, or exceptions from the tax herein imposed. In the absence of such proof, the sales shall be deemed to have been taxable." The Borough contends that Bulletin 75–1 is a "rule" issued by the Mayor within the meaning of this ordinance. Ordinance 3.48.110(A), however, requires the assembly to approve the rules adopted by the mayor. There has been no showing that Bulletin 75–1 was issued by the Mayor or was approved by the Assembly. Accordingly, Underwood's failure to mark the customers' card numbers on the invoices or sales slips did not make those transactions taxable as a matter of law. The tax status of these transactions cannot be determined on this record.

### B. *Sales for Resale*

■ The next category of sales challenged are sales that Underwood claims were to persons who were in the business of reselling the goods and who purchased the goods for the purpose of resale. "Sales to wholesale and retail dealers in the property sold, for the purpose of resale within the borough by such dealer" are not "retail sales" within the definition of Ordinance 3.48.010(E)(1) and hence are not subject to a sales tax under Ordinance 3.48.020. Underwood contends that $7,281.03 in sales deemed taxable by the Borough fall within this category. Although the Borough contends that "the specific buyers were clearly not in the business of reselling the items listed," Underwood submitted an affidavit in which he stated that he was told and he believed that all of the customers purchased the items for the purpose of reselling them. This is sufficient to create a material issue of fact, precluding resolution of the issue on summary judgment.

■ The Borough argues that as a matter of law these sales cannot be exempt from taxation because Underwood did not establish one of the defenses available under Ordinance 3.48.160(C). This ordinance provides as follows:

A seller who in the course of his business makes sales upon which a tax is levied hereunder and who fails to collect such taxes shall incur a civil penalty of double the tax which should have been collected. The following shall constitute defenses:

1. The securing, in good faith, of a "certificate of exemption or exception" from the buyer;

2. Proof of belief, based upon advice of legal counsel, or the mayor, that this chapter did not tax such sales or require collections of the tax, or collection by the defendant plus notification in writing to the mayor of such belief prior to such sale;

3. A reasonable attempt, in good faith, to collect the tax from the buyer.

The defenses listed, however, are only affirmative defenses, operating to relieve a seller of liability *after* the Borough establishes that the transaction was taxable. In view of the factual disputes that exist, the Borough has not yet established that the transactions were taxable. Accordingly, this ordinance is not applicable. ·

### C. *Sales for Farm Use*

■ The last category of sales at issue between the parties are sales that Underwood contends were to farmers for farm use, exempt from taxation under Ordinance 3.48.050(I). $9,615.32 of the sales were disallowed by the Borough because they were to persons who did not have tax exempt cards as farmers. Such cards were issued under and required by Sales Tax Information Bulletin No. 75–1. They were not required, however, by any ordinance. As we have already indicated, the tax bulletin did not necessarily create substantive laws affecting the tax status of particular transactions. Accordingly, Underwood's sales to persons who did not have a tax exempt card are not necessarily taxable. As with the

sales disallowed because Underwood did not write the customer's card numbers on the invoices or sales slips, whether or not these transactions were taxable depends upon whether or not they were exempted by Ordinance 3.48.050(I) and whether the tax bulletin was issued by the Mayor with the approval of the Assembly. These are matters to be determined by the superior court on remand. If the sales were indeed "sales of animal food, seed, plants, and fertilizer to farmers for farm use," then they were not taxable and Underwood is not liable for any civil penalty for failing to collect the tax.

The judgment of the superior court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with this opinion.